[Cite as *State v. Coleman*, 2014-Ohio-5320.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO. 1-13-53

      v.

ERIC L. COLEMAN,                     O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2013-0124

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: December 1, 2014

APPEARANCES:

    *Michael J. Short* **for Appellant**

    *Terri L. Kohlrieser* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Eric L. Coleman ("Coleman"), appeals the judgment entry of sentencing of the Allen County Court of Common Pleas. He argues that the trial court erred by sentencing him to additional prison time based on a violation of his post-release control in another case, that his convictions are against the manifest weight of the evidence, and that the trial court erred by failing to merge his convictions for kidnapping and rape for purposes of sentencing. For the reasons that follow, we affirm in part and reverse in part.

{¶2} On May 16, 2013, the Allen County Grand Jury indicted Coleman on Count One of rape in violation of R.C. 2907.02(A)(2), a first-degree felony, and on Count Two of kidnapping in violation of R.C. 2905.01(A)(4), a first-degree felony. (Doc. No. 3). Both counts contained repeat-violent-offender specifications under R.C. 2929.01(CC) and 2941.149. (*Id.*). The indictment stemmed from a March 30, 2013 incident in which Coleman allegedly lured a woman, H.C., into a truck he was driving, drove to the parking lot of an apartment complex, and raped her inside the truck.

{¶3} At the arraignment hearing on May 24, 2013, Coleman entered pleas of not guilty. (May 24, 2013 Tr. at 6). Coleman waived his right to a jury trial, and on August 26 and 27, 2013, the trial court held a bench trial on the indictment. (Aug. 26, 2014 Tr. at 1); (Doc. Nos. 68, 86). The trial court found Coleman guilty

of Counts One and Two and filed its "verdict of court & judgment entry" on September 3, 2013. (Aug. 27, 2013 Tr. at 597-598); (Doc. No. 86).

{¶4} The trial court held a sentencing hearing on October 9, 2013. (Oct. 9, 2013 Tr. at 1). The trial court heard argument concerning whether the offenses of which the trial court found Coleman guilty—rape and kidnapping—merged under R.C. 2941.25. (*Id.* at 34-42). The trial court concluded that the offenses did not merge. (*Id.* at 42). The trial court also concluded that Coleman is a repeat violent offender and that he was on post-release control ("PRC") for another case at the time he committed the offenses in this case—a violation of the terms of Coleman's PRC. (*Id.* at 81, 85, 87-88). The trial court sentenced Coleman to, among other things, 11 years imprisonment on Count One, 7 years imprisonment on Count Two, 10 years imprisonment on the repeat-violent-offender specification, and 806 days imprisonment on the PRC violation, to be served consecutively for an aggregate prison term of 28 years and 806 days. (*Id.* at 87-90); (Doc. No. 89). The trial court filed its judgment entry of sentence on October 15, 2013. (Doc. No. 89).

{¶5} On October 21, 2013, Coleman filed a notice of appeal. (Doc. No. 94). He raises three assignments of error for our review. We address Coleman's second assignment of error first, followed by his third and first assignments of error.

**Assignment of Error No. II**

**The conviction [sic] is against the manifest weight of the evidence.**

{¶6} In his second assignment of error, Coleman argues that his convictions for rape and kidnapping are against the manifest weight of the evidence. Coleman does not dispute that a "sexual incident" occurred between him and H.C.; rather, he argues that the sex was "consensual." (Appellant's Brief at 3). He argues that H.C. lacks credibility. Specifically, he argues that H.C.'s testimony at a preliminary hearing concerning what she was wearing at the time of the incident contradicted her trial testimony. He also argues that a convenience-store worker's testimony contradicted H.C.'s account of the events. Coleman argues that the scientific evidence was "not dispositive" and that the medical evidence was "equivocal." (*Id.* at 8). Finally, Coleman argues that the trial court excused a "major discrepancy" in H.C.'s testimony but did not treat Coleman the same way when he admitted to lying in his direct examination concerning where the incident occurred. (*Id.*).

{¶7} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact]

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶8} Coleman was convicted of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4). R.C. 2907.02 sets forth the crime of rape and provides, in relevant part: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Sexual conduct" means, among other things,

"vaginal intercourse between a male and female," "anal intercourse," and, "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶9} R.C. 2905.01 sets forth the crime of kidnapping and provides, in relevant part:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will; * * *.

R.C. 2905.01(A)(4). R.C. 2907.01(C) defines "sexual activity" as, among other things, "sexual conduct" as defined in R.C. 2907.01(A), the relevant portion of which we excerpted above. "Force" is defined in R.C. 2901.01(A)(1), which we also excerpted above. The Revised Code does not define "deception" for purposes of R.C. Chapter 2905. *State v. Hatten*, 186 Ohio App. 3d 286, 2010-Ohio-499, ¶ 39 (2d Dist.). However, courts have applied the following definition of "deception" found in R.C. 2913.01(A), the theft and fraud statute, to R.C. Chapter

-6-

2905 because it "conforms to the generally accepted meaning of the word 'deception'":

> "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

*Id.*, quoting R.C. 2913.01(A).

{¶10} At trial, the State presented the testimony of 12 witnesses; however, based on Coleman's arguments, we need only discuss the testimony of six of them. The State called H.C. as a witness. (Aug. 26, 2013 Tr. at 45). She testified that she met Coleman in March 2013 through Rachel Johnson ("Johnson")—H.C.'s friend and Coleman's half-sister who, like H.C., resided at the "Lima West" apartment complex—after H.C. saw a picture of Coleman. (*Id.* at 45-46, 58). H.C. "was kind of attracted to him and everything." (*Id.* at 46-47). H.C. and Coleman exchanged phone numbers and began sending text messages to each other. (*Id.* at 47-48). According to H.C., she made known to Coleman that she was interested in him, and Coleman sent H.C. a text message "saying something

about he wanted to fuck," but H.C. told him she "did not want to do that." (*Id.* at 48-49). H.C. recited a series of text messages that Coleman and H.C. exchanged on March 29, 2013, as reflected as follows in State's Exhibit 25:

Coleman:    What up

Coleman:    U trin to fuck

H.C.:    No

H.C.:    Why you fighting with your girl

H.C.:    Did I send you a pic?

Coleman:    Nawh i aint whats up

H.C.:    I ain't on that just yet

Coleman:    Well im coo

Coleman:    So i guess u aint on it

H.C.:    I ain't trying to fuck I am trying to get to no you

Coleman:    Well thats what u im on fa real

H.C.:    Huh

Coleman:    I said im on fuckin is it

H.C.:    Oh I'm cool then

Coleman:    Yep

(State's Ex. 25); (Aug. 26, 2013 Tr. at 51-54). H.C. testified that she intended to convey in her text messages to Coleman that she "did not want to have sex."

(Aug. 26, 2013 Tr. at 52-54).  By her text message, "Oh I'm cool then," H.C. meant, "That I'm fine because I'm not…I wasn't on having sex.  I did not want to have sex."  (*Id.* at 54).

{¶11} H.C. then recited a series of text messages found in State's Exhibit 25 that Coleman and H.C. exchanged about 24 hours later, beginning at 1:02 a.m. on March 30, 2013:

| | |
|---|---|
| H.C.: | Are you busy |
| Coleman: | No |
| H.C.: | I'm bored as hell right now |
| Coleman: | I aint got no data and i aint doin nothin at rays wit my sis |
| Coleman: | Drinkin … but u trin to see me tonight |
| Coleman: | Yep |
| H.C.: | I mean idk I don't want to have sex I need a damn drink myself shit |
| H.C.: | Is that what you wanted? |
| Coleman: | Im jus trin to chill |
| H.C.: | Were at |
| Coleman: | Where u at that where |

(State's Ex. 25); (Aug. 26, 2013 Tr. at 54-57). The text messages between Coleman and H.C. ceased until approximately three hours later, at 4:50 a.m., when H.C. resumed the text messaging after waking up:

> H.C.: Sorry I fell a sleep
>
> H.C.: But if you up lima west
>
> Coleman: So whats up
>
> H.C.: I was sleep sorry about that I have been so damn drained lately idk were you at
>
> H.C.: What are you doing

(*Id.*); (*Id.* at 57-58).

{¶12} H.C. testified that after exchanging those text messages, she and Coleman spoke on the phone. (Aug. 26, 2013 Tr. at 59). H.C. testified that she missed two calls from Coleman, but Coleman called H.C. again and told her "that he needed to speak with [her]" about Johnson. (*Id.*). According to H.C., Coleman said it was "important" and that he was on his way and would be there in a minute. (*Id.*). Coleman's voice made H.C. worried, H.C. testified. (*Id.* at 60-61). H.C. "assumed something was really wrong with [Johnson] * * * like she went to jail or she got in a fight." (*Id.* at 60). H.C. testified that she was in shorts and a tank top, so she put on "a brazier," "an overtop," a pair of jeans, and "some boot like things and a jacket." (*Id.* at 60, 71-72).

{¶13} According to H.C., she went outside to "see what was going on with [Johnson]" and saw Coleman in a white pickup truck. (*Id.* at 60). H.C. testified that she "got into the truck like a dummy," thinking she could trust Coleman and expecting him to talk to her about Johnson. (*Id.* at 61). According to H.C., once she got in the truck, she asked Coleman what was going on with Johnson, and Coleman "just looked at [her]," "gave [her] a dead look," and "took off." (*Id.* at 62). H.C. testified that she was "yelling at him," saying, "Dude, where are we going? My kids are in the house. What are you doing? Take me back home." (*Id.* at 62-63). Coleman ignored H.C., she testified. (*Id.* at 63).

{¶14} H.C. testified that Coleman turned onto several streets, and she was "really spazzing out" and demanding that Coleman take her back home to her children. (*Id.*). According to H.C., Coleman then struck her on the side of her face and took her to "some apartment complex" where he "parked like diagonal from the * * * apartment complex in the parking lot," alongside some bushes. (*Id.* at 63, 84-85); (State's Ex. 34). H.C. testified that Coleman "just started like trying to kiss on [her]" and "kept trying to yank [her] pants off [her]," but H.C. kept saying, "No. What are you doing? Just take me home. I don't want to do this. I told you I don't want to do this. Just take me home." (Aug. 26, 2013 Tr. at 63). But, according to H.C., Coleman "just kept doing it." (*Id.*). H.C. testified that once Coleman "pulled everything off," he "put his face * * * on [her] vagina and

[she] pushed him off" before he could perform oral sex on her. (*Id.* at 63, 66). According to H.C., she said, "No. Don't. Stop. Stop. Just take me home." (*Id.* at 64).

{¶15} H.C. testified that Coleman hit her, pulled her legs up, and had vaginal sex with her while she screamed, "Stop. Stop. Stop." (*Id.*). According to H.C., Coleman "kept hitting [her]" with a closed fist and said, "Shut the fuck up bitch. Shut the fuck up bitch." (*Id.* at 64, 67). H.C. testified that Coleman told her to turn around, grabbed her hair, made her turn around, and "had sex with [her] anally." (*Id.* at 64). According to H.C., Coleman said "something about the condom breaking." (*Id.*). H.C. did not know Coleman put a condom on. (*Id.* at 67). H.C. testified that during the vaginal sex, she was screaming and yelling at Coleman, "[t]ell[ing] him no," but during the anal sex, she "just gave up" because she was scared Coleman would pull a knife or gun on her. (*Id.*).

{¶16} According to H.C., Coleman "said he was thirsty," so H.C. said she was thirsty, too, "because the only thing [she] could think of was [she knew] a lot of people at Circle K and [she] didn't want anybody to say [she] wasn't with him or anything because [she] wanted to go to the police." (*Id.* at 64). H.C. also knew that Circle K had cameras. (*Id.* at 69). H.C. testified that she pulled her "stuff on," and they went to Circle K, which was H.C.'s idea. (*Id.* at 64, 68). According to H.C., she had her phone and "was going to sit out in the car," but Coleman said,

"No, you're coming with me because you're not calling the fucking police on me." (*Id.* at 64-65). So, H.C. testified, she went into Circle K with Coleman and "tried playing everything off because [she] didn't know what to do." (*Id.* at 65). According to H.C., she paid for Coleman's drinks at Circle K "because [she] was scared and [she] was hoping and praying that he would take [her] home so [she] kind of just tried to play it off to make it as if everything was going to be okay so [she] could get home." (*Id.* at 80). H.C. testified that there was "one lady" in Circle K, but H.C. did not notice any other customers. (*Id.* at 69). H.C. testified that she did not think to ask the lady to call the police because she "was so shook up and scared about what just happened." (*Id.*).

{¶17} H.C. and Coleman got their drinks, went to the truck, and Coleman took H.C. back to Lima West. (*Id.* at 65). According to H.C., when Coleman dropped her off, "he told [her] that if [she went] to the police or the hospital he was going to fucking hurt [her] and [her] kids." (*Id.*). H.C. testified that she got out of the truck, went straight into the apartment, and told her mother what happened. (*Id.*). Her mother told H.C. she needed to go to the hospital, but H.C. did not want to, she testified, because she was afraid of what Coleman said. (*Id.*). According to H.C., she "got the courage," went to the restroom, got a sanitary napkin when she noticed vaginal bleeding, and changed out of her jeans and boots into sweatpants and sandals, and she and her mother went to St. Rita's Medical

-13-

Center ("St. Rita's").  (*Id.* at 65, 70-72, 80).  H.C. had not taken a shower.  (*Id.* at 70).  H.C. recalled testifying at a preliminary hearing in the municipal court that she was wearing a tank top with a grey sweater, sweatpants, and sandals at the time of the rape; however, she was in fact wearing jeans and boots at the time of the rape, and she misunderstood the question at the preliminary hearing.  (*Id.* at 70-72).

{¶18} On her way to the hospital, H.C. stopped at Circle K and asked employees there to make for law enforcement a copy of the video of her and Coleman's time there.  (*Id.* at 75-76).  Circle K made a copy of the video.  (*Id.* at 76).  At the hospital, hospital staff performed a rape kit on H.C. and took x-rays of her face.  (*Id.* at 72).  According to H.C., the police arrived and photographs of H.C.'s face were taken, which depicted scratches, bruising, and swelling caused by Coleman.  (*Id.* at 72, 80-84); (State's Exs. 1, 2, 3, 4, 5).  H.C. told police at the hospital about the Circle K surveillance video.  (Aug. 26, 2013 Tr. at 75).  While she was at the hospital, at 10:42 and 10:43 a.m., H.C. received two text messages from Coleman:

> Coleman:  Fa real smh u sayin i raped u and u gave it up willinly
> u dirty I will never so dont play me if I raped u how i
> have time to put a condom on

> Coleman:     I still got it in my pocket and txt messages of u tellin
>
> me to come to lima west

(State's Ex. 26); (Aug. 26, 2013 Tr. at 73-74). According to H.C., "smh" stands for "shaking my head" in text language. (Aug. 26, 2013 Tr. at 74). H.C. did not respond to Coleman's text messages. (*Id.*).

{¶19} On cross-examination, H.C. could not recall telling hospital staff that she might have scratched herself on the right side of her face. (*Id.* at 88). H.C. admitted that she did not inform the hospital staff that she was wearing different pants before and after she was raped than the pants she wore to the hospital, but she said she "was just so shook up" that she did not realize she left out that detail, and she "thought the main thing would be like the underwear." (*Id.* at 89-91). After viewing still-photographs of the Circle K surveillance video, H.C. agreed that she and Coleman walked into Circle K at 6:15 a.m. and that there were at least five people in Circle K during the few minutes that she and Coleman were there, but she did not say anything to any of them, including the female clerk, who H.C. has known "for quite a while." (*Id.* at 92-100); (Defendant's Exs. D, E, F, G, H, I, J). H.C. did not recall another Circle K customer being ahead of her and Coleman in line to pay. (Aug. 26, 2013 Tr. at 97). H.C. could not recall telling Johnson that she would probably have sex with Coleman, except H.C. was on her period. (*Id.* at 101). H.C. agreed that she told Coleman "he was nice looking" and that she

-15-

"made it real clear" that she was extremely interested in Coleman. (*Id.* at 102-103).

{¶20} The State called H.C.'s mother, Victoria, to testify. (*Id.* at 33). She testified that in the early morning of March 30, 2013, H.C. woke her up crying. (*Id.* at 36-37). According to Victoria, H.C. told her that she had just been raped and beaten. (*Id.* at 37). Victoria testified that H.C. told her that H.C.'s friend's brother called H.C. to say something was wrong with his sister and that he needed to talk to H.C. (*Id.*). According to Victoria, H.C. said she went out to talk to her friend's brother, and "he ended up leaving with her and she didn't want to leave." (*Id.*). H.C. "kept telling him that she wanted to come back," and "he wouldn't bring her back." (*Id.*). Victoria testified that H.C. said her friend's brother "wasn't trying to talk to her," "just all of a sudden acted crazy," "started hitting her," "started raping her" when "she got to a certain place," and "started just taking over on her." (*Id.* at 37-38). According to Victoria, H.C. said that when her friend's brother dropped H.C. off, "he threatened her kids, to kill them and to kill her." (*Id.* at 38). Victoria convinced H.C. to go to the hospital and accompanied her there. (*Id.* at 38-39). Victoria testified that H.C.'s face "was like messed up" and "all cut up and bruised," as reflected in a photograph labeled State's Exhibit 1. (*Id.* at 37, 39-41).

{¶21} On cross-examination, Victoria testified that she did not tell H.C. to take a shower or change clothes before leaving for the hospital. (*Id.* at 42-43).

{¶22} The State called Andrea Burkholder ("Burkholder"), a registered nurse in the emergency room at St. Rita's, to testify. (*Id.* at 124, 127). Burkholder testified that she served as H.C.'s primary nurse when H.C. came to St. Rita's on the morning of March 30, 2013. (*Id.* at 128-129). H.C. had visible injuries when she arrived at St. Rita's. (*Id.* at 130). Burkholder performed a rape kit on H.C. (*Id.* at 132). H.C. informed Burkholder that she had been penetrated with a penis vaginally and anally. (*Id.* at 138). According to Burkholder, H.C. indicated that she was not menstruating. (*Id.* at 138, 140). Burkholder testified that as part of a rape kit, the layer of clothing closest to the victim's skin, such as underwear, is collected for the kit; however, Burkholder also gave the other clothing H.C. was wearing to Patrolman Jason Rhodes ("Rhodes") of the Lima Police Department. (*Id.* at 139-140).

{¶23} During her testimony, Burkholder described several injuries to H.C.'s face that Burkholder documented in the rape kit. (*Id.* at 141-142). Burkholder testified that she noted no trauma to the outside of H.C.'s vaginal area, but H.C. did have petechiae—which Burkholder described as "little red dots * * * similar to bruising"—at two locations inside her cervix. (*Id.* at 142-145). Burkholder noted bleeding from H.C.'s cervix, but she did not notice any tears.

(*Id.* at 145-146). Burkholder turned over to Rhodes the rape kit she performed on H.C. (*Id.* at 150). Burkholder testified that while H.C. was at St. Rita's, Burkholder learned that H.C.'s alleged rapist was sending text messages to H.C., so Burkholder instructed H.C. not to respond and informed police. (*Id.* at 152).

{¶24} On cross-examination, Burkholder testified that one would not get a petechia "just from gentle sex." (*Id.* at 156). Rather, according to Burkholder, "it would have to be * * * rough sex or a traumatic sexual experience to get" a petechia. (*Id.*). Burkholder did not recall H.C. telling her that H.C. might have scratched herself on the right side of her cheek, but if H.C. did tell her that, Burkholder would have noted it in her rape-assessment report. (*Id.* at 160).

{¶25} On re-direct examination, Burkholder testified that a doctor's notes indicated that H.C. might have scratched herself while trying to protect herself. (*Id.* at 162).

{¶26} The State's next witness was Kara McKee ("McKee"), who was in a relationship with Coleman on March 30, 2013.[1] (*Id.* at 168-169). McKee testified that she allowed Coleman to use her truck shortly after 5:30 a.m. that day so that Coleman could go get breakfast for McKee's son and nephew. (*Id.* at 175-178). According to McKee, Coleman "was gone for 2 hours," and she "knew something wasn't right" and became upset. (*Id.* at 176-177). McKee testified that she tried

---

[1] The record reflects that Coleman was in a relationship with multiple women as of March 30, 2013; however, it was Whitney Blanchard who Coleman considered his "girlfriend." (Aug. 27, 2013 Tr. at 484).

contacting Coleman "at least over 50 times," paid someone to drive her around to look for the truck, and called the police department and hospital. (*Id.*). According to McKee, when Coleman finally returned, he said, "I went to McDonald's like you said," and, "I was only gone 15 minutes." (*Id.* at 178).

{¶27} The State called Detective Steven Stechschulte ("Stechschulte") of the Lima Police Department. (Aug. 27, 2013 Tr. at 373). He testified that because H.C. did not know the precise location where Coleman took her, Stechschulte took H.C. to two apartment complexes that he believed might be where the incident occurred. (*Id.* at 374-377). According to Stechschulte, when he and H.C. arrived at the parking lot for the Terrace Court apartments, H.C. "immediately" identified it as where Coleman took her and became "visibly upset" and "did not want to get out of the car." (*Id.* at 377-378). The Terrace Court apartments are approximately six or seven blocks from the last turn she remembered Coleman making in the truck. (*Id.* at 377). Stechschulte testified that during his investigation, he learned that Coleman "was staying off and on during that time" in Apartment 15 at the Terrace Court apartments, which is where Coleman's girlfriend, Whitney Blanchard ("Blanchard"), was residing. (*Id.* at 380, 384).

{¶28} During her direct examination of Stechschulte, counsel for the State played for the trial court State's Exhibit 41, which Stechschulte identified as a video of his April 4, 2013 interview of Coleman. (*Id.* at 391-394). In the

interview, Coleman told Stechschulte that he and H.C. had sex at his "friend Raymond's" house. (State's Ex. 41). Coleman said in the interview that he just met Raymond and did not know his last name, but Raymond gave Coleman a key to his house because he was out of town. (*Id.*). Coleman told Stechschulte that Raymond's house was on West Street, but he did not know the address. (*Id.*). After several questions by Stechschulte, Coleman told Stechschulte that Raymond's house was on West Street close to "the tracks." (*Id.*). Coleman said in the interview that he recently met Raymond "through a mutual friend," but he could not tell Stechschulte who the mutual friend was "because it's a bad friend." (*Id.*). Coleman told Stechschulte in the interview that he and H.C. had "some porn-star sex type stuff." (*Id.*).

{¶29} Stechschulte testified that he found a man named "Raymond" in his investigation, but he lived in one of the buildings at the Terrace Court apartments, which was not where Coleman told Stechschulte "Raymond's" house was. (*Id.*); (Aug. 27, 2013 Tr. at 402). According to Stechschulte, the Raymond residing at the Terrace Court apartments informed Stechschulte that he did not really know Coleman and would never give anyone a key to his house. (Aug. 27, 2013 Tr. at 402).

{¶30} Stechschulte also testified that Coleman gave him three cell phones, which were analyzed by Sergeant Terry Sneary ("Sneary") of the Allen County

Sheriff's Office. (*Id.* at 398-399). Finally, Stechschulte testified that in his experience, it was not out of the ordinary for H.C. to not inform someone in Circle K that she had been raped. (*Id.* at 425-426). Stechschulte observed that it is not uncommon for a rape victim, particularly one who has been threatened, to try to cause the least amount of friction possible and simply try to make it out of the situation safely. (*Id.* at 426).

**{¶31}** The State called Sneary to testify. (*Id.* at 317). Sneary testified that he analyzed three cell phones. (*Id.* at 322). According to Sneary, his analysis revealed that one of the phones placed three outgoing calls on March 30, 2013 to a phone number labeled in the cell phone as "Baby Sis (Other Phone)": one call at 5:21 a.m. lasting 36 seconds; another call at 5:28 a.m. lasting 31 seconds; and another call at 5:31 a.m. lasting one minute, 35 seconds. (*Id.* at 340-343); (State's Exs. 32, 33). In her testimony, H.C. testified to the phone number she gave Coleman, which was the same number labeled as "Baby Sis (Other Phone)" in Coleman's cell phone. (Aug. 26, 2013 Tr. at 47-48).

**{¶32}** In his case, Coleman called three witnesses, the first of whom was Nicole Raymond ("Nicole"). (*Id.* at 451). Nicole testified that she was at work at Circle K between 6:00 and 6:30 a.m. on March 30, 2013 when she noticed H.C., a regular customer every day or every other day, come into Circle K. (*Id.* at 452-453). According to Nicole, when H.C. came into Circle K with Coleman, H.C.

"appeared normal," "just like any other day." (*Id.* at 454). Nicole testified, "It wasn't anything out of the ordinary to me." (*Id.*). However, Nicole did notice that H.C. "wasn't really as talkative as she normally was." (*Id.*). Nicole was able to see H.C.'s face clearly in good lighting and did not see any bruises or marks on H.C. (*Id.*).

{¶33} On cross-examination, when counsel for the State asked Nicole if she was "paying particular attention to everything about [H.C.] and the defendant," Nicole responded, "Not really. * * * I wasn't staring at details or anything like that or, you know, I couldn't tell you what she wearing [sic] or anything like that. I just knew she was there and I didn't see * * * anything obvious that jumped out at me." (*Id.* at 462).

{¶34} Johnson was Coleman's second witness. (*Id.* at 464). She testified that a day or two after she met Coleman in late March 2013, H.C. and Coleman were at Johnson's apartment "just talking" along with several others. (*Id.* at 466-469). According to Johnson, H.C. left her apartment after being there for two or three hours. (*Id.* at 469-470).

{¶35} Finally, Coleman testified. (*Id.* at 478). He testified that he met Johnson for the first time on March 26, 2013. (*Id.* at 480). According to Coleman, in response to Johnson posting photographs of him on Facebook, H.C. asked Johnson about Coleman. (*Id.* at 482). Eventually, Coleman sent a text

message to H.C. using Johnson's phone, saying, "I likely have a girlfriend. I do but I don't have a girlfriend, you know, but we could be friends. We could talk." (*Id.* at 482-483). Coleman's on-again, off-again girlfriend was Blanchard, with whom he was not living but would spend the night occasionally. (*Id.* at 483-485). Coleman testified that H.C. "asked [him] to add her to [Coleman's] Facebook page." (*Id.* at 483). According to Coleman, he and H.C. exchanged cell phone numbers and communicated by text messages. (*Id.* at 485). Coleman testified that he "was being a player" and disguised H.C. in his phone as "Baby Sis Other Phone" so Blanchard would not discover H.C.'s contact in his phone. (*Id.*).

{¶36} According to Coleman, he asked H.C. in text messages whether she was trying to have sex with him. (*Id.* at 498). Coleman understood H.C.'s responses to mean that she did not want to have sex with him, so Coleman "left her alone" and "didn't expect to hear from [her] again." (*Id.* at 498-499). Coleman testified that approximately 24 hours after those text messages, he received a text message from H.C., prompting him to wonder why H.C. was texting him after he indicated to her that he wanted to have sex with her. (*Id.* at 499). According to Coleman, H.C. again indicated that she did not want to have sex with him, and Coleman responded, saying that he did not want to have sex either and was "just trying to chill." (*Id.* at 500). Coleman testified that he and H.C. exchanged those text messages at approximately 2:00 in the morning, and he

did not receive another text message from H.C. again until approximately 5:00 that morning. (*Id.*). According to Coleman, H.C. indicated that she fell asleep and that she was at Lima West if Coleman was up. (*Id.*). Coleman testified that "at that point * * * [he] call[ed] [H.C.] like, 'I'm on my way.' And she said, 'Yeah.' She said, 'Okay.'" (*Id.* at 501).

{¶37} Coleman testified that he "had been drinking, but * * * wasn't drunk to the point where [he] couldn't drive," so he took McKee's white pickup truck, drove to Lima West, and pulled into the "first driveway" there. (*Id.* at 501-502). According to Coleman, he called H.C. while he was in the first driveway, and H.C. told him that he needed to go to the second driveway. (*Id.* at 502). So, Coleman testified, he asked H.C. to stay on the phone, which he put on his lap, while he turned the truck around and into the second driveway. (*Id.*). According to Coleman, when he pulled up, H.C. came out and got into the truck. (*Id.*). Coleman denied that he lured H.C. into the truck by telling her he needed to speak with her about Johnson. (*Id.* at 502-503).

{¶38} Coleman testified that once H.C. got into the truck, she asked where they were going, and he responded, "We going to this little spot." (*Id.* at 504). According to Coleman, H.C. said Coleman must be fighting with his girlfriend, to which Coleman responded, "Nah. My girl's at work." (*Id.*). Coleman testified that H.C. again asked where they were going, and he responded, "We going to

-24-

my…my dude [sic] house." (*Id.*).  According to Coleman, H.C. said that they better not be going to Coleman's girlfriend's house because that would be disrespectful.  (*Id.* at 504-505).  Coleman testified that the conversation stopped at that point.  (*Id.* at 505).  According to Coleman, he did not strike or punch H.C. while he was driving, nor did H.C. mention her children or request that Coleman take her home.  (*Id.* at 504-505).

{¶39} Coleman testified, "When we get to the apartments all we did was * * * kiss in the truck."  (*Id.* at 505).  Then, according to Coleman, he and H.C. got out of the truck, "walk to [his] dude [sic] house," go into the house, sit on the couch, and "get to kissing."  (*Id.*).  Coleman testified that H.C. got up off the couch and took her pants off, and Coleman retrieved a condom out of his shoe and put it on.  (*Id.*).  According to Coleman, he and H.C. then had "basic consensual sex," and Coleman did not "force her or beat her up or pull her hair or sock her in the face."  (*Id.* at 506).

{¶40} Coleman's counsel asked him where it was that he took H.C., and Coleman declined to disclose that information:

> At the time I…At the time, and I'm still not at the liberty to
> even answer that question because she said that we had sex in the
> truck.  And we didn't have sex in the truck like I told Detective
> Stechschulte.  And we didn't have sex in the truck so I'm not at

liberty to give up anything * * * because I knew she was…Because I knew she was lying about we had sex…We had sexual intercourse in the truck. So I…I'm not at liberty to give up no apartment, no nothing, because it proves that she was wrong. It proves that she was lying.

When she…If she had of came out and said we had sex in the apartment I would of said that. I would have…I would have agreed with her. But she said we had sex in the truck. I'm not at liberty to give up no apartment.

(*Id.* at 507). The trial court instructed Coleman to answer the question of where the sexual incident occurred, and Coleman responded, "In the apartment." (*Id.* at 508). When his counsel asked, Coleman did not recall the address of the apartment, nor could he provide a location of the apartment. (*Id.*).

{¶41} Coleman testified that he did not mention to H.C. that he was thirsty or request that they go to Circle K. (*Id.* at 509). According to Coleman, he and H.C. went to Circle K, and he got two Red Bulls out of the cooler and walked over to the drink machine where H.C. was getting a pop. (*Id.*). Coleman testified that he and H.C. walked to the cash register and had "a little argument" over who was going to pay for the drinks, and H.C. ultimately paid for them. (*Id.*). According to Coleman, they left Circle K in the truck, and he dropped H.C. off at home at

"about 6:22 in the morning" and "didn't say anything to her." (*Id.* at 510-511). That was the last time Coleman saw H.C. (*Id.* at 511). According to Coleman, on March 30, 2013, he "knew [he] was going to be arrested" because he knew H.C. "reported a rape" and because "if they type [his] name in the computer what will pop up about [him]." (*Id.* at 512-513).

{¶42} On cross-examination, Coleman testified that he met Johnson for the first time on March 26, 2013—a Tuesday—and that he was mistaken when he told Stechschulte that he met Johnson on a Wednesday. (*Id.* at 516-517). Coleman met H.C. for the first time on Thursday, March 28, 2013. (*Id.* at 517). Coleman admitted that Blanchard was living at the Terrace Court apartments in late March 2013. (*Id.* at 519-520). Coleman testified that he deleted text messages between him and H.C., but he wished he would have saved them. (*Id.* at 525). Coleman admitted to having vaginal intercourse with H.C., and he testified that during vaginal intercourse, his penis "slipped" out, and he accidentally inserted his penis into H.C.'s anus, but he "didn't keep going." (*Id.* at 527).

{¶43} Counsel for the State then asked Coleman about "Raymond," at whose house Coleman told Stechschulte he and H.C. had sex. (*Id.*). Coleman testified that at the time of his videoed, April 4, 2013 interview with Stechschulte, Coleman "was kind of hung over." (*Id.* at 528). According to Coleman, Raymond's house "was an apartment," but he could not recall several details about

the apartment—such as whether it was on West Street, brick or siding, one story or two—even though he had been to the apartment "multiple times." (*Id.* at 528-534). When counsel for the State asked Coleman for the name of the mutual friend through whom he met Raymond, Coleman responded, "I ain't at liberty. I can't give that up." (*Id.* at 534). According to Coleman, he would "be considered as a snitch" if he revealed the mutual friend's name, and he refused to give even a first name. (*Id.* at 535). When counsel for the State asked Coleman for Raymond's last name, he responded, "I'm not at liberty to tell you that." (*Id.* at 536). When the trial court instructed Coleman to answer and asked him for Raymond's full name, Coleman responded, "I don't know." (*Id.* at 537).

{¶44} On re-direct examination, Coleman revealed that he and H.C. had sex in Blanchard's apartment, not at "Raymond's" house: "We had sex in my girlfriend [sic] house. * * * I was afraid to tell. To even tell her. We had sex in her house." (*Id.* at 539-540).

{¶45} On re-cross examination, Coleman admitted that he lied concerning where he and H.C. had sex because he did not want Blanchard to know that they had sex at her apartment. (*Id.* at 541).

{¶46} Based on the evidence above, we cannot conclude that Coleman's rape and kidnapping convictions were against the manifest weight of the evidence. Coleman admitted that he and H.C. had sex, which made H.C. and Coleman

-28-

important witnesses in this case. According to H.C.'s version of the events, Coleman used deception to lure H.C. into the truck. Coleman falsely represented to H.C. that he needed to talk to her about Johnson, giving H.C. the false impression that something was wrong with her friend. Once H.C. was in the truck, Coleman "took off," removing her from the place where she was found. Despite H.C.'s protests and requests that Coleman take her back to Lima West, Coleman restrained H.C. in the truck as they traveled down several streets, striking H.C. on the side of the face at one point.

{¶47} Once parked in the parking area for the Terrace Court apartments, Coleman began kissing H.C. and, again despite her telling him to stop and to take her home, purposely forced her by violence and constraint to submit against her will to have vaginal and anal intercourse with him, hitting her with a closed fist and grabbing her hair inside the truck. Photographic evidence revealed scratches and bruising on H.C.'s face, which H.C.'s mother, Victoria, and the emergency-room nurse, Burkholder, observed as well. Nicole, the Circle K employee who was familiar with H.C., noted that H.C. was less talkative than usual when she and Coleman were in the store. Finally, H.C. explained the inconsistency between her preliminary-hearing testimony and her trial testimony, indicating that she misunderstood the question at the preliminary hearing.

{¶48} The evidence weighing against Coleman's convictions was far less weighty. First and foremost, Coleman's credibility was far below H.C.'s. Coleman admitted during re-direct examination that he lied to Stechschulte and in his earlier trial testimony. Specifically, he admitted that he and H.C. had sex in Blanchard's apartment, not at "Raymond's." While on the stand, Coleman often could not recall important details, and his story appeared to constantly evolve. For example, he told Stechschulte in his interview that he and H.C. had "some porn-star sex type stuff," but on the stand, Coleman testified that he and H.C. had "basic consensual sex." Finally, Coleman admitted to deleting text messages between H.C. and him. The trial court cited this evidence and these inconsistencies in concluding that "the believability of [H.C.] far, far outweigh[ed] that of the defendant." (Aug. 27, 2013 Tr. at 596). After reviewing the record, we agree with the trial court's credibility analysis and afford no weight to Coleman's version of the events.

{¶49} We also disagree with Coleman's argument that Nicole's testimony contradicted H.C.'s account of the events. While Nicole testified that she did not notice any marks or bruising on H.C.'s face and that H.C. "appeared normal," she also admitted on cross-examination that she was not paying particular attention to H.C. and Coleman. Moreover, considering what had just happened to H.C. and that Coleman warned her not to call the police, it was unsurprising that H.C. did

not notify anyone in Circle K or that H.C. paid for their drinks. She explained that she was just trying to make it home safely to her children. Finally, because Coleman admitted to having sex with H.C., we agree with Coleman that the scientific evidence alone is "not dispositive" and that the medical evidence is "equivocal" concerning whether Coleman raped H.C. Rather, H.C.'s and Coleman's versions of the events are important, and Coleman's ever-evolving version is without weight compared to H.C.'s version and the evidence supporting it.

{¶50} For all of these reasons, the evidence does not weigh heavily against Coleman's rape and kidnapping convictions. We, therefore, cannot conclude that the trial court clearly lost its way and created such a manifest miscarriage of justice that the rape and kidnapping convictions must be reversed and a new trial ordered.

{¶51} Coleman's second assignment of error is overruled.

### Assignment of Error No. III

**The trial court erred in not merging the rape and kidnapping convictions for sentencing purposes.**

{¶52} In his third assignment of error, Coleman argues that the kidnapping and rape offenses of which he was convicted were allied offenses of similar import and that the trial court erred by not merging them for purposes of sentencing.

Specifically, Coleman argues that while the trial court found that H.C.'s confinement in the truck subjected her to a substantial increase in risk of harm, the evidence demonstrated that H.C. "willingly entered the truck" and "re-entered the vehicle after she purchased beverages * * * at the Circle K." (Appellant's Brief at 11). Coleman also disputes the trial court's conclusion that Coleman's confinement of H.C. was secretive, in part because Coleman took the truck in a secretive way. Coleman argues that "there was a continuous course of conduct." (*Id.*). We disagree.

{¶53} "Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo." *State v. Johnson*, 3d Dist. Allen No. 1-13-45, 2014-Ohio-4750, ¶ 97, citing *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15.

{¶54} R.C. 2941.25, Ohio's multiple-count statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or

with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25, the court must first determine whether it is possible to commit both offenses with the same conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 48. "If the multiple offenses can be committed with the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind." *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting).

{¶55} If it is possible to commit the offenses with the same conduct and the defendant did, in fact, commit the multiple offenses with the same conduct, then the offenses are allied offenses of similar import and will merge. *Id.* at ¶ 50. However, "if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each, then according to R.C. 2941.25(B), the offenses will not merge." (Emphasis sic.) *Id.* at ¶ 51. "'The defendant bears the burden to prove entitlement to merger.'" *State v. Love*, 3d

Dist. Marion No. 9-13-09, 2014-Ohio-437, ¶ 25, quoting *State v. Forney*, 2d Dist. Champaign No. 2012-CA-36, 2013-Ohio-3458, ¶ 10.

{¶56} Here, Coleman was convicted of rape and kidnapping. The State concedes, and we agree, that it is possible to commit rape and kidnapping with the same conduct. (Appellee's Brief at 21). *State v. Anderson*, 9th Dist. Summit No. 26640, 2014-Ohio-1206, ¶ 8; *State v. Rivera*, 10th Dist. Franklin No. 10AP-945, 2012-Ohio-1915, ¶ 60. Therefore, we will proceed to the second step of the analysis set forth by the Supreme Court of Ohio in *Johnson* and determine whether the offenses were committed by the same conduct. *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, at ¶ 48.

{¶57} In *State v. Logan*, the Supreme Court of Ohio provided guidance concerning when kidnapping and another offense are committed with a separate animus:

In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where

-34-

the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

60 Ohio St.2d 126, syllabus. *See also Stall*, 2011-Ohio-5733, at ¶ 20-21. The Court in *Logan* added, "Secret confinement, such as in an abandoned building or nontrafficked area, without the showing of any substantial asportation, may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense." *Logan* at 135.

{¶58} We conclude that Coleman's kidnapping and rape convictions do not merge because Coleman's conduct of luring H.C. into the truck by deception and transporting her to the parking area of the Terrace Court apartments was not the same conduct that constituted the rape. In other words, Coleman did not kidnap and rape H.C. in a single act with a single state of mind. Rather, they were separate acts with separate states of mind.

{¶59} First, Coleman's restraint of H.C. was prolonged so as to demonstrate a significance independent of the rape offense. The evidence demonstrated that Coleman lured H.C. into the truck at approximately 5:31 a.m., that Coleman drove her down several streets before arriving at the parking area for the Terrace West apartments, that Coleman and H.C. arrived at Circle K at 6:15 a.m., and that Coleman dropped H.C. off at Lima West approximately seven minutes after they arrived at Circle K. In other words, Coleman restrained H.C. in the truck for nearly 45 minutes even before they arrived at Circle K, and much of that time in the truck was spent traveling. This amounts to "prolonged" restraint. *See State v. Vargas*, 10th Dist. Franklin No. 12AP-692, 2014-Ohio-843, ¶ 29-30 (concluding that the restraint of the victim was "prolonged, long-term restraint" where the victim "was confined and restrained for 30 to 40 minutes while the defendants drove her around the city"); *State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136, ¶ 46 (concluding that the defendant's detention of the victim was prolonged where the defendant drove the victim "around for quite some time in the car before [the defendant] drove to the location where the rape occurred").

{¶60} Second, Coleman's confinement of H.C. was secretive so as to demonstrate a significance independent of the rape offense. The secrecy surrounding Coleman's confinement of H.C. began when he took McKee's truck

for two hours despite her request that Coleman take the truck to purchase food at McDonald's. Coleman lured H.C. into the truck in the early morning hours on a Saturday. Once she was inside the truck, he "took off," confining her while he drove to the parking lot of an apartment complex, where he parked alongside bushes. This constitutes secretive confinement. *See State v. Smith*, 10th Dist. Franklin No. 94APA09-1300, 1995 WL 170316, *5 (Apr. 6, 1995) ("[The victim] was confined in secret as evidenced by the fact that the defendant drove her to a dark alley or street in order to have intercourse with her.").

{¶61} Third, Coleman's movement of H.C. was substantial so as to demonstrate a significance independent of the rape offense. The precise distance between Lima West, where Coleman lured H.C. into the truck, and the Terrace Court apartments, where Coleman raped H.C., is not clear from the evidence introduced at trial. However, based on Stechschulte's trial testimony, Lima West and the Terrace Court apartments are at least more than six or seven blocks from one another. And Stechschulte stated at the sentencing hearing that he followed the route H.C. said Coleman took, and it was 2.1 miles from Lima West to the Terrace Court apartments. (Oct. 9, 2013 Tr. at 27-28). These facts demonstrate Coleman's substantial movement of H.C. *See Smith* at *5 ("The restraint was prolonged and the movement substantial in that the victim was driven around before, during, and after the assaults.").

**{¶62}** Finally, Coleman's asportation and restraint of H.C. subjected H.C. to a substantial increase in risk of harm separate and apart from that involved in the rape. First, "the hazard of traveling in an auto for a prolonged period of time increased the potential risk of harm." *Greathouse*, 2007-Ohio-2136, at ¶ 46. *See also Vargas*, 2014-Ohio-843, at ¶ 33, citing *Greathouse* at ¶ 46 and *State v. Henry*, 37 Ohio App. 3d 3, 9 (6th Dist.1987). Second, while Coleman was transporting H.C. to the location of the rape, he struck H.C. on the side of her face. *See State v. Worth*, 10th Dist. Franklin No. 10AP-1125, 2012-Ohio-666, ¶ 81 (concluding that the defendant's restraint of the victim subjected her to a substantial increase in risk of harm separate and apart from the rapes where, "[p]rior to engaging in any sexual conduct with [the victim], appellant knocked her to the floor, held her down, and repeatedly struck her in the face"). These facts demonstrate that Coleman's movement and restraint of H.C. subjected her to a substantial increase in risk of harm separate and apart from the rape.

**{¶63}** For the reasons above, we hold that Coleman committed the kidnapping and rape offenses with separate conduct and with separate animus for each offense. Therefore, Coleman's kidnapping and rape offenses are not allied offenses of similar import, and the trial court did not err by not merging Coleman's kidnapping and rape convictions for purposes of sentencing.

**{¶64}** Coleman's third assignment of error is overruled.

**Assignment of Error No. I**

**The trial court erred in imposing post release control time.**

{¶65} In his first assignment of error, Coleman argues that the trial court improperly sentenced Coleman "to an additional 806 days for violation of [PRC] from a case (Allen County Case No. CR 2005 0365), in which [Coleman] was sentenced to 4 years in prison for felonious assault and 3 years for a gun specification." (Appellant's Brief at 6). Coleman argues that the court that sentenced him in 2006 did not correctly notify him concerning PRC. Specifically, Coleman argues that that court's sentencing entry indicated that Coleman may be subjected to up to three years of PRC; however, three years of PRC was mandatory because Coleman was convicted of felonious assault, a second-degree felony. He argues that: (1) because he has completed his prison sentence, the sentencing error cannot be corrected; and (2) because he "was not properly placed on [PRC]," the trial court erred by sentencing him to 806 days in prison based on a PRC violation. (*Id.* at 7).

{¶66} The State argues, on the other hand:

[T]he failure of the [sentencing] court to include in its journal entry that PRC was mandatory for three years pursuant to [R.C. 2929.19(B)(2)(c)] did "not negate, limit, or otherwise affect the mandatory period of supervision that [was] required" for the

defendant under R.C. 2967.28 despite the fact that he had completed his prison term without his judgment entry of sentencing being corrected to reflect that PRC of three years was mandatory.

(Appellee's Brief at 10). The State also suggests that notwithstanding the error in the sentencing entry in case number CR2005 0365, during Coleman's sentencing hearing in that case, the trial court correctly advised him that "upon his release he will be subject to post release control of three years."[2] (*Id.* at 8).

**{¶67}** A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; that the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law. *State v. Ramos*, 3d Dist. Defiance No. 4-06-24, 2007-Ohio-767, ¶ 23 (stating that "the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *"); *State v. Rhodes*, 12th Dist. Butler No. CA2005-10-426, 2006-Ohio-2401, ¶ 4; *State v. Tyson*, 3d Dist. Allen Nos. 1-04-38 and 1-04-39, 2005-Ohio-1082, ¶ 19, citing R.C. 2953.08(G).

---

[2] The transcript of the sentencing hearing in case number CR2005 0365 is not part of the record in this case. Nevertheless, having the transcript before us would not affect our disposition of Coleman's first assignment of error. *See State v. Pyne*, 8th Dist. Cuyahoga No. 100580, 2014-Ohio-3037, ¶ 8, 15, fn. 1.

{¶68} We conclude that the portion of Coleman's sentence that the trial court imposed based on Coleman's violation of his PRC—806 days imprisonment to be served consecutively with the sentences imposed for the kidnapping and rape offenses and the repeat-violent-offender specification—was clearly and convincingly contrary to law. The State's reliance on R.C. 2967.28(B) and 2929.19(B)(2)(c) is misplaced.[3] "When a judge fails to properly impose statutorily mandated postrelease control as part of a defendant's sentence, the postrelease-control sanction is void." *State v. Holdcroft*, 137 Ohio St.3d 526, 2013-Ohio-5014, paragraph two of the syllabus, applying *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238. Notwithstanding the language of R.C. 2967.28(B) and 2929.19(B)(2)(c) quoted by the State, the Supreme Court of Ohio has held, "For criminal sentences imposed on and after July 11, 2006, in which a trial court failed to properly impose postrelease control, trial courts shall apply the procedures set forth in R.C. 2929.191." *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, paragraph two of the syllabus. *See also State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, ¶ 69, quoting *Singleton* at paragraph two of the syllabus. *But see State v. Clark*, 2d Dist. Clark No. 2012 CA 16, 2013-Ohio-299, ¶ 34 (observing that "[t]he three dissenting justices [in *Singleton*] argued that R.C.

---

[3] We cannot fault the State, however, because "the Ohio Supreme Court's jurisprudence in the ever-evolving area of postrelease control has been anything but easy to decipher * * *." *Pyne*, 2014-Ohio-3037, at ¶ 12.

2929.191 was clear and limited its own application to sentences imposed prior to the effective date of the act").

{¶69} "R.C. 2929.191 * * * establishes a procedure to remedy sentences that fail to properly impose a term of post-release control for defendants who were sentenced on or after its July 11, 2006 effective date." *State v. Smalls*, 5th Dist. Stark No. 2013CA00086, 2013-Ohio-5674, ¶ 17, citing *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, ¶ 92, citing *Singleton* at paragraph two of the syllabus. R.C. 2929.191 provides that a PRC-related sentencing error must be corrected before the defendant completes his or her prison term:

If, prior to July 11, 2006, a court imposed a sentence including a prison term of a type described in division (B) (2)(c) of section 2929.19 of the Revised Code and failed to notify the offender pursuant to that division that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison or to include a statement to that effect in the judgment of conviction entered on the journal or in the sentence pursuant to division (D)(1) of section 2929.14 of the Revised Code, at any time *before the offender is released from imprisonment* under that term and at a hearing conducted in accordance with division (C) of this section, the court may prepare and issue a correction to the judgment of

conviction that includes in the judgment of conviction the statement

that the offender will be supervised under section 2967.28 of the

Revised Code after the offender leaves prison.

(Emphasis added.) R.C. 2929.191(A)(1). "[O]nce an offender has been released from prison, he cannot be subjected to another sentencing to correct the trial court's flawed imposition of postrelease control." *Holdcroft* at ¶ 11, citing *State v. Bloomer*, 122 Ohio St.3d 200, 2009-Ohio-2462, ¶ 70 and *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, syllabus, ¶ 38. In other words, under R.C. 2929.191 and the jurisprudence of the Supreme Court of Ohio, once an offender completes his prison term, time has run out for the sentencing court to apply R.C. 2929.191 and correct its flawed imposition of PRC. *See id.* As a result, the PRC portion of the original sentence remains void, and a court cannot impose a prison term for a violation of the improperly imposed PRC. *Holdcroft* at paragraph two of the syllabus, applying *Fischer*; *State v. Billiter*, 134 Ohio St.3d 103, 2012-Ohio-5144, ¶ 12, citing *Fischer* at paragraph one of the syllabus; *State v. Lee*, 1st Dist. Hamilton No. C-120307, 2013-Ohio-1811, ¶ 15-16; *State v. King*, 5th Dist. Muskingum No. CT2012-0009, 2012-Ohio-4580, ¶ 8.

{¶70} The Supreme Court of Ohio has also stated that if a sentencing court properly notified a defendant concerning PRC at the sentencing hearing but failed to include the PRC notification in its sentencing entry, the court may use a nunc

pro tunc entry to correct the error as long as it does so before the defendant completes his or her prison sentence. *State v. Qualls*, 131 Ohio St.3d 499, 2012-Ohio-1111, syllabus, ¶ 24. The Court in *Qualls* held: "When a defendant is notified about postrelease control at the sentencing hearing, but notification is inadvertently omitted from the sentencing entry, the omission can be corrected with a nunc pro tunc entry and the defendant is not entitled to a new sentencing hearing." *State v. Bundy*, 7th Dist. Mahoning No. 12 MA 86, 2013-Ohio-2501, ¶ 21, quoting *Qualls* at syllabus. In reaching its holding, the Court in *Qualls* stated:

> [W]hen the notification of postrelease control was properly given at the sentencing hearing, the essential purpose of notice has been fulfilled and there is no need for a new sentencing hearing to remedy the flaw. The original sentencing entry can be corrected to reflect what actually took place at the sentencing hearing, through a nunc pro tunc entry, *as long as the correction is accomplished prior to the defendant's completion of his prison term.*

(Emphasis sic.) *Bundy* at ¶ 21, quoting *Qualls* at ¶ 24.

{¶71} *King* is similar to this case. In that case, the Fifth District Court of Appeals reversed the appellant's sentence because the trial court imposed a term of imprisonment based on the appellant's violation of a void PRC sanction:

Appellant argues his post-release control in Muskingum County Case Number CR2003-7A was improperly imposed because the trial court journal entry reads,

"The court further notified the defendant that post release control is mandatory in this case up to a maximum of five (05) years as well as the consequences for violating conditions imposed by the parole board under Revised Code § 2967.28."

The Ohio Supreme Court in *State v. Fischer*, 128 Ohio St.3d 92 (2010), held a sentence that does not include the statutorily mandated term of post-release control is void, is not precluded from appellate review by principles of res judicata, and may be reviewed at any time, on direct appeal or by collateral attack.

Appellant's sentence imposing post-release control in the underlying case, CR 2003-7A, was void as the trial court failed to state a definite term of post-release control. Appellant had served his entire sentence in Case No. CR2003-7A, had not been resentenced, and there was no nunc pro tunc entry filed correcting the improper post-release control imposition according to *State v. Bloomer* 122 Ohio St.3d 200, 2009-Ohio-2462 and *State v. Simpkins* 117 Ohio St.3d 420, 2008-Ohio-1197. Accordingly, we find the trial

court erred in imposing a prison term for violating a "void" post release control sanction.

*King* at ¶ 5-8.

**{¶72}** In this case, the State concedes that the sentencing court in October 2006 improperly imposed PRC and that Coleman was released from imprisonment in that case before the sentencing court corrected the improperly imposed PRC sanction. Indeed, in case number CR2005 0365, Coleman was convicted of felonious assault, a second-degree felony, resulting in a mandatory three-year PRC sanction. *See* R.C. 2967.28(B)(2). However, the sentencing court's entry stated that the three-year PRC term was discretionary: "Upon completion of the prison term, the defendant shall be subject to such further period of supervision under POST RELEASE CONTROL as the parole board may determine pursuant to law (up to 3 years)." (Oct. 9, 2013 Tr. at 9, State's Ex. 2). As was the case in *King*, the court in case number CR2005 0365 did not remedy its improper imposition of PRC before Coleman's release from prison. *See King* at ¶ 8. Therefore, Coleman's PRC sanction in case number CR2005 0365 is void, and the trial court in this case erred in imposing a sentence of 806 days in prison based on a violation of that void PRC sanction.

**{¶73}** Coleman's first assignment of error is sustained.

{¶74} For the foregoing reasons, the judgment of the Allen County Common Pleas Court is affirmed in part and reversed in part, and the matter is remanded to the trial court for resentencing consistent with our disposition of the first assignment of error.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J., concurs in Judgment Only as to**
    **Assignment of Error No. 1**

**SHAW, J., concurs.**

**/jlr**